UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Khulangoo Rizaj,

Plaintiff,

vs.

New York Genome Center, Inc.,

Defendant.

Case No.        26cv3215

**COMPLAINT**

JURY TRIAL DEMANDED

Plaintiff Khulangoo Rizaj ("Plaintiff") by and through her counsel Nisar Law Group, P.C.

complains of Defendant New York Genome Center, Inc.'s ("Defendant") for discrimination and

retaliatory discharge based on her Asian race in violation of 42 USC §1981, NYS Executive Law

§296 et seq. and NYC Human Rights Law 8-107 et seq, and retaliation against Plaintiff for

engaging in protected activity in violation of NYLL §740 et seq. and alleges as follows:

## I.        NATURE OF THE CASE

1.        On or about June 6, 2025, Plaintiff Khulangoo Rizaj ("Rizaj") who is Asian American was

summarily terminated from her continuous employment since on or about June 2023 as the director

of research administration ("DRA") by Defendant New York Genome Center, Inc. ("NYGC").

On the same day of Plaintiff's discharge, she was displaced or replaced by, based upon information

and belief an unqualified African/Black American ("AA") employee.  This AA employee was

unqualified based upon information and belief because she was previously removed from the DRA

position for negative work performance.  Plaintiff's summary discharge and replacement was

based on Defendant's unlawful racial preference for or activism to retain African or Black

American employees at the expense of Asian American employees and its racial animus, enmity,

and/or ambivalence towards Asian American employees including Plaintiff.  Defendant's unlawful

race preference was underscored by its replacement of Plaintiff with an employee who based upon

1

information and belief, had previously been removed by Defendant from the DRA position due to her lack of qualifications to perform her duties, a history of negative work performance evaluations and staff complaints about her inability to effectively lead them to success in their positions.  In stark contrast, Plaintiff who is Asian American (AsianAm), was at all relevant times more qualified by experience and education in her DRA position and received positive work performance feedback from management and staff.  Shortly after the announcement of Plaintiff's discharge on or about June 2025, several staff members of the RA department quit their positions with Defendant.    The U.S. Supreme Court has long held such race based preferences to be discriminatory and unlawful.  *See e.g., Students for Fair Admissions, Inc., Petitioner v. Harvard College and Univ. of N. Carolina et al*.  600 US 181, 273 (2023)   (The Court held, "Given the history of discrimination against Asian Americans…it seems particularly incongruous to suggest that a past history of segregationist policies toward blacks should be remedied at the expense of Asian American[s].")    Prior to Plaintiff's arrival at Defendant, instead of discharging the AA employee after she was removed from the DRA position, NYGC made her the head of their diversity, equity and inclusion ("DEI") department for a higher salary.   Based upon information and belief, after Executive Order 14173 issued by the President of the United States on or about January 21, 2025,  which prohibited federal contractors such as Defendant from maintaining "Illegal DEI" practices and policies, Defendant disbanded its DEI department and placed the AA employee back in her old position as DRA with her higher salary rate in order to preserve her employment, at the sole expense of Plaintiff not withstanding her high qualifications because she was an undesired AsianAm employee.   Under 42 USC §1981, Defendant unlawfully discharged Plaintiff based on her Asian race or "but for" her Asian race, she would not have been discharged. Under New York State Executive Law ("NYS HRL") §296 et seq and New York City Human

2

Rights Law ("NYC HRL") §8-107, Defendant NYGC unlawfully discharged Plaintiff based at least in part on her Asian race and/or she was treated less well than AA employees because she was a member of the AsianAm racial group.

2. <u>Whistleblower Activities and Retaliation</u>   From on or about February 2025 through on or about June 2025, Plaintiff made repeated complaints to management that NYGC was in violation of its obligations under its federal contracts and applicable federal law, rules and regulations to perform Specialized Service Facility cost analysis studies to ensure it was not overcharging the government for its services.  In close temporal proximity to these complaints that Plaintiff in good faith believed NYGC was violating the law, Defendant NYGC summarily discharged her on or about June 6, 2025 in violation of NYLL §740.  Accordingly, Plaintiff seeks redress and recovery of damages available under all applicable statutes including but not limited to: compensatory damages including back pay, lost wages, front pay in lieu of reinstatement, emotional distress damages, damages for reputational harm, punitive damages, and reasonable attorney's fees and costs in amounts to be determined at the time of trial and any and other further relief that this Court deems just and proper.

## II. <u>JURISDICTION</u>

3. Pursuant to 42 USC §1981, this Court has jurisdiction over the instant race discrimination claims against Plaintiff's former employer Defendant NYGC that is, based upon information and belief, a private corporate entity.

4. Venue is proper in this District under 31 USC §3732 and 28 USC §1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims occurred in this District and Defendants transacted business and maintained an office in this District.

5. Pursuant to 28 USC §1367(a) this Court may exercise supplemental jurisdiction over Plaintiff's related state law claims for race discrimination pursuant to NYS HRL §296 et seq. and NYC HRL §8-107 et seq and retaliatory discharge in violation of NYLL §740 as all of the state claims alleged arise out of a common nucleus of operative facts during Plaintiff's employment with Defendant NYGC.

### III.    <u>STATEMENT OF FACTS</u>

<u>THE PARTIES</u>:

6. Plaintiff was employed at the NYC office of Defendant NYGC as a director of research administration ("DRA") from on or about June 26, 2023 to on or about June 6, 2025.

7. The focus of the DRA role was on managing grants for NYGC from government and private contracts and oversight of single audits of these grants.

8. Plaintiff's work responsibilities required her to work with Finance and Accounting, Human Resources and IT on federal grants and institutional audit preparedness.

9. At all relevant times, based on its registration with the New York State Department of State, Defendant NYGC was a Delaware not for profit corporation with its principal business located at 101 6th Avenue, New York, N.Y. 10013 and authorized to do business in New York State.

10. As advertised at its website [www.nygenome.org/about-us](www.nygenome.org/about-us), NYGC "is an independent nonprofit academic research institution that serves as a multi-institutional hub for collaborative genomic research.

11. Based upon information and belief, at all relevant times, NYGC provided genome sequencing services to the U.S. Government and/or NIH.

12.    Based upon information and belief, during the relevant time period, NYGC was approximately 60% federally funded by these federal contracts.

13.    At all relevant times, NYGC was an employer within the meaning of the relevant federal and state statutes.

14.    At all relevant times, Plaintiff was a qualified employee within the meaning of the relevant federal and state statutes.

15.    At all relevant times, as DRA, Plaintiff was in charge of information systems implementation for pre and post award grant accounting.

16.    Pricing or price rates charged to the government and private clients were determined by a separate department, the genome sequencing team at NYGC.

17.    A third party consulting firm such as Huron Consulting was needed to perform research and cost analysis on Defendant's federal and private grants to comply with federal grants requirements because NYGC in-house staff lacked the financial analysis expertise to perform such analyses.

18.    At all relevant times, Nancy Kong, Senior Director of Accounting and Comptroller was responsible for obtaining third party cost analyses for NYGC's federal contracts for genome sequencing.

19.    At all relevant times, Elizabeth "O'Brien" O'Brien was the Vice President and Legal Counsel to NYGC.

20.    At all relevant times, Controller Nancy Kong and Elizabeth O'Brien, Vice President and Legal Counsel to NYGC were responsible for oversight of Specialized Service Facility ("SSF") audits and SSF cost analyses in compliance with federal regulations, specifically 2 CFR §200.468 which requires that SSF charges to the government must be based on actual costs, driven by usage

and applied consistently across all users.   In short, NYGC, Controller Nancy Kong and Elizabeth O'Brien, Vice President and Legal Counsel were required to ensure that the U.S. government was not charged more for the same or similar services than Defendant's private clients by conducting cost analysis studies through a third party for every fiscal year.

21.    During the relevant time period of Plaintiff's employment, Heather Lewis ("Lewis"), an AA woman headed NYGC's unlawful DEI / EEG programs and practices.

22.    Based upon information and belief, prior to Plaintiff's hire as DRA on or about June 26, 2023, Ms. Lewis was already removed from the DRA position because of her lack of competence or qualifications to perform her duties as DRA based on her negative work performance evaluations and staff complaints about her inability to adequately perform in her position as a manager.    Notwithstanding, because Ms. Lewis was the sole AA employee at NYGC at the leadership level, NYGC made Ms. Lewis the "face" of the company on its website to promote, and further tout its AA employee in furtherance of its illegal DEI policies and practices.

23.    At all relevant times, there were significant numbers of AsianAm employees at NYGC including in the RA department that Plaintiff and Ms. Lewis managed at various times.  However, NYGC never made AsianAm employees the face of the company to the public or to the government as it did with Ms. Lewis.  In fact, NYGC relegated its AsianAm employees including Plaintiff into the background or "back room" to hide their physical Asian attributes despite their high qualifications, professional accolades or high level of employment. Specifically, NYGC deliberately effaced its workplace of AsianAm employees including Plaintiff by preferentially aligning with and/or promoting its sole leadership level AA employee despite her significant lack of qualifications and professional accomplishments and accolades.  This practice was blatantly racist against AsianAm employees including Plaintiff and this conduct was indicative of

Defendant's animus, enmity and/or ambivalence towards its AsianAm employees including Plaintiff.

**Plaintiff's Race Discrimination Claim pursuant to 42 USC §1981**

24.    42 USC §1981 states in relevant part, [a]ll persons within the jurisdiction of the United States shall have the same right in every State…to make and enforce contracts…and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

25.    The "make and enforce contracts" provision includes the employee-employer relationship in an employee's employment with the employer.

26.    The "property" provision of §1981 includes wages earned from employment.

27.    §1981 (c) protects US citizens from impairment of rights by "nongovernmental discrimination and impairment under color of State law."

28.    On or about January 21, 2025, the President of the United States Donald J. Trump issued executive order ("EO") 14173 requiring federal contractors to certify that they would not engage in illegal discrimination including operating illegal DEI programs to avoid de-funding and/or termination of contracts by the United States

29.    Based upon information and belief, prior to Plaintiff's commencement of employment as DRA, Heather Lewis was removed from the same DRA position due to incompetence or poor work performance and complaints from staff that Ms. Lewis was an ineffective manager that adversely impacted their ability to perform their duties within the department.

30.    Based upon information and belief, after being removed from the DRA position due to lack of qualifications, instead of discharge, Defendant NYGC moved Ms. Lewis to lead its Diversity, Equity and Inclusion Office with a salary increase significantly greater than Plaintiff's salary.

31.   Defendant NYGC's conduct of displacing Plaintiff with Ms. Lewis in the DRA role again, after it removed Ms. Lewis from the DRA position during 2023 for poor work performance and no pre or post grant award experience, was in direct contradiction of management's stated pretext that it discharged Plaintiff because of "a need for someone with more experience in post-award and compliance."

32.   As alleged throughout this Complaint, Plaintiff possessed significantly more experience in post-award compliance than Ms. Lewis who, based upon information and belief had little to no post award compliance experience prior to her hire by NYGC for the DRA position.

33.   In stark contrast, at her time of hire in June 2023, Plaintiff had significant post-award and accounting experience from reputable firms in NYC that based upon information and belief, Ms. Lewis lacked.

34.   At the time of Plaintiff's discharge on or about June 6, 2025, Plaintiff had no history of poor work performance or negative work evaluations or workplace discipline.

35.   At all relevant times, Plaintiff was also respected and well liked by her staff.  After learning of Plaintiff's discharge, several of her staff members quit their employment with Defendant NYGC.

36.   On or about April 2025, instead of abolishing its DEI department headed by Ms. Lewis pursuant to President Trump's January 21, 2025 Executive Order, Defendant renamed the department "Employee Engagement Group" to carry on its unlawful DEI policies that discriminated based on race.

37.   Based upon information and belief, because its DEI office was diluted, NYGC removed Plaintiff from her position for the purpose of placing Ms. Lewis in a full time position with

knowledge that Ms. Lewis was not qualified for the DRA position.  Moreover, NYGC allowed Ms. Lewis to maintain her significantly larger salary for the DRA position that she was not qualified for.

38.    As alleged throughout this Complaint, based upon information and belief, despite Ms. Lewis' removal from the DRA position due to lack of qualifications,  because Ms. Lewis, was the sole AA employee in a leadership role at NYGC, it made her the "face" of the company on NYGC's company website to tout its AA employee at the expense of AsianAm employees including Plaintiff who were relegated to the background and completely ignored their contributions, accomplishments and professional accolades.

39.    As alleged throughout this Complaint, at all relevant times, there were significant numbers of AsianAm employees at NYGC including Plaintiff as opposed to the small number of AA employees.  However, NYGC never made its AsianAm employees including Plaintiff, the face of the company to the public or to the government as it did with Ms. Lewis.  Defendant NYGC deliberately effaced its workplace of AsianAm employees including Plaintiff in order to hide their physical Asian characteristics from public view in favor of exclusively aligning with and/or promoting AA diversity and inclusion.  This practice was blatantly racist against AsianAm employees including Plaintiff because it disregarded the significant qualifications or meritorious work and accomplishments of the AsianAm employees including Plaintiff while it simultaneously disregarded the significant and comparable lack thereof of the AA employee who was promoted and touted as valuable within the company.

40.    The displacement of Plaintiff by Ms. Lewis irrespective of Ms. Lewis' proven lack of qualifications for the role of DRA, and only because Ms. Lewis was the sole AA employee in a leadership role, was an unlawful race preference for its AA employee and adverse employment

9

action taken against Plaintiff due to her Asian race.  This conduct established circumstances giving rise to the inference of Defendant's discriminatory animus towards AsianAm employees including Plaintiff and its discriminatory actions taken against Plaintiff based on her Asian race.  Defendant's knowingly and maliciously continued its unlawful DEI policies and practices against Plaintiff in violation of and in knowing or reckless disregard for the Supreme Court's long standing precedent that raced based preferences are illegal discrimination based on race.

41.     The United States Supreme Court ("the Court") re-iterated in *SFFA v. Harvard* in relevant part, "We have time and again ***forcefully rejected*** the notion that government actors may intentionally allocate preference to those who may have little in common with one another but the color of their skin…One of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities…"  *See, Students for Fair Admissions, Inc., Petitioner v. Harvard College and Univ. of N. Carolina et al*.  600 US 181, 220 (2023)

42.     Regarding racial preferences, the Supreme Court has further explained, "Given the history of discrimination against Asian Americans, especially their history with segregated schools, it seems particularly incongruous to suggest that a past history of segregationist policies toward blacks should be remedied at the expense of Asian American[s]"  *See, Students for Fair Admissions, Inc., Petitioner v. Harvard College and Univ. of N. Carolina et al*.  600 US 181, 273 (2023).  Similar and analogous to student admissions, employment in a company role is a zero-sum proposition where preference for one excludes or cuts off the other from an opportunity.

43.     In malicious and wanton disregard for the law, Defendant discharged Plaintiff based on her Asian race and replaced her with Ms. Lewis who is AA despite Ms. Lewis' lack of qualifications to remedy its perceived historical discriminatory policies against Black Americans at Plaintiff's

expense. This was malicious, blatant and wanton racism targeted against Asian American employees including Plaintiff and a reasonable fact finder would infer that these circumstances gave rise to an inference of discrimination against Plaintiff based on her Asian race and/or illegal race preference discrimination.

44. A fact finder may reasonably find that but for Plaintiff's Asian race, she would not have been discharged to be displaced by an unqualified employee who was the preferred AA race.

45. Accordingly, Defendant NYGC discriminated against Plaintiff and unlawfully discharged Plaintiff in violation of 42 USC §1981 and seeks all available redress and remedies including but not limited to: back pay, lost wages, front pay in lieu of reinstatement, emotional distress damages, damages for reputational harm, punitive damages, reasonable attorney's fees, costs in amounts to be determined at the time of trial and any and other further relief that this Court deems just and proper.

## State Anti-Discrimination Clams

46. New York State Executive Law ("NYS HRL") § 296 provides in relevant part, " 1. It shall be an unlawful discriminatory practice: (a)… because of an individual's … race …to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

47. New York City Administrative Code ("NYC HRL") §8-107(1) states in relevant part, "It shall be an unlawful discriminatory practice: (a) For an employer … because of the actual or perceived **race** …of any person …to discharge such person..."

48. As set forth throughout this Complaint, Defendant discriminated against Plaintiff by discharging her from employment at least in part based on her Asian race and was treated less well than Ms. Lewis who is AA, was unqualified for the position yet displaced Plaintiff in the DRA position.

11

49.     As alleged throughout this Complaint, prior to Plaintiff's hire, despite Ms. Lewis' poor work performance in the DRA position, Ms. Lewis was promoted to head the DEI office with a significant raise well above Plaintiff's salary.  Ms. Lewis also retained the higher salary for the DRA position even after she displaced Plaintiff.

50.     As alleged throughout this Complaint, Asian American employees were effaced from the company website and other public facing marketing and promotional materials in favor of Ms. Lewis solely base their respective race.

51.     As alleged throughout this Complaint, Defendant promoted Ms. Lewis as the "face" of the company solely based on her AA race regardless of her lack of qualifications or merit based work history.

52.     As alleged throughout this Complaint, Defendant engaged in blatant racism against its Asian American employees including Plaintiff by relegating them to the background and discharging Plaintiff to displace her with Ms. Lewis thereby ignoring all of the Asian American employees in Plaintiff's work contributions, professional accolades and qualifications, and chose to align itself with the AA, DEI employee regardless of her significant lack of similar qualifications, contributions, and/or professional accolades in the DRA position.

53.     A fact finder may reasonably infer that Defendant NYGC and its management held a racial animus towards AsianAm employees including Plaintiff.

54.     A fact finder may reasonably conclude that Plaintiff's discharge was at least in part motivated by her Asian race.

55.     Accordingly, Plaintiff seeks all damages and relief under the NYS HRL §296 et seq. and/or the NYC HRL 8-107 et seq. including but not limited to: back pay, front pay in lieu of reinstatement, lost wages, benefits and other remuneration, compensatory including mental

anguish damages, punitive damages, attorney's fees and costs of the lawsuit in amounts to be determined at the time of trial.

**NYLL 740 Claim**

56.    New York Labor Law ("NYLL") §740(2) states in relevant part, "An employer shall not take any retaliatory action against an employee, whether or not within the scope of the employee's job duties because such employee does any of the following:…discloses, to a supervisor …an activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation…"

57.    As alleged throughout this Complaint, NYGC had federal contracts to perform genome sequencing services for the federal government, specifically the National Institutes of Health ("NIH")

58.    These federal service contracts required Defendant to perform a cost analysis under 2 CFR 200.468 which states in relevant part, "(a) The costs of services provided by highly complex or specialized facilities operated by the recipient or subrecipient are allowable provided the charges for the services meet the conditions of either paragraph (b) or (c) of this section and take into account any items of income or Federal financing that qualify as applicable credits under 200.46. These costs include charges for facilities such as computing facilities…"

59.    2 CFR 200.468(b) states in relevant part, " (b) The costs of such services, when material, must be charged directly to the applicable Federal awards based on actual usage of the services on the basis of a schedule of rates or established methodology that:

(1) Does not discriminate between activities under Federal awards and other activities of the recipient or subrecipient, including usage by the recipient or subrecipient for internal purposes; and

13

(2) Is designed to recover on the aggregate costs of the services.  Each service's costs must normally consist of its direct costs and an allocable share of all indirect costs.  Rates must be adjusted at least biennially and must consider any over or under-applied costs of the previous period(s).

60.    On or about February 2025, Plaintiff advised NYGC's VP and Legal Counsel O'Brien and Director of Accounting and Controller Kong that, under the requirements of its federal awards, NYGC had not performed the required Specialized Service Facilities ("SSF") cost analysis for fiscal year 2025 through a third-party consultant such as Huron Consulting Services ("Huron"). Huron, acting as a consultant, had previously completed the SSF cost analysis for fiscal year 2024 using 2023 financial data. However, no SSF cost analysis was performed in 2025 during Plaintiff's employment, even though it should have been based on 2024 financial data. The Single Audit for fiscal year 2023 was performed by KPMG, whose scope was limited to the federal audit requirements and did not include an SSF cost analysis.

61.    Thus, in good faith, Plaintiff believed that a proper SSF cost analysis was not performed for fiscal year 2024 in 2025.  Despite Plaintiff's repeated communications to management from on or about February 2025 through June 2025 that such a cost analysis was a federal requirement and should be completed in advance of the due date of September 2025, Comptroller Kong stated to Plaintiff that management was not interested in completing a cost analysis study at that time.

62.    Based upon information and belief, Defendant continued to charge SSF related expenses to federal grants in 2025 without a rate study, reconciliation or annual documentation – a clear violation of Uniform Guidance and a potential Single Audit risk.

63.    Based upon information and belief, Defendant knowingly and willfully failed to obtain cost analyses from a qualified third party in order to save on those costs to hire a third party and to

14

retain the full amount of the federal award or to reduce the amount it would have to pay or transmit to the government.

64.     A blind spot in this regulation was that there was no trigger for the United States to demand compliance.  The scenario where the United States would be made aware of this lack of a single audit would be one where a knowledgeable third party firm made a report stating that such analyses were not completed.  In the instant case, because no cost analysis was performed for fiscal year 2024, there was no accounting firm or professional to report that no such audit was performed.

65.     Throughout the time period February to June 2025, Plaintiff raised this concern of the SSF cost analysis compliance risk with Kong and O'Brien in staff meetings and in one on one meetings with each of them to no avail.

66.     In a matter of weeks, or in close temporal proximity to Plaintiff's complaints to Defendant's management about the SSF compliance risk, from on or about May 2025, Plaintiff was excluded from strategic planning and operational decisions and her contributions at staff meetings and leadership / management meetings were minimized by Kong or Kong took credit for Plaintiff's work.

67.     On or about May 2025, when Plaintiff again confronted Kong with the single audit compliance risk, Kong stated to Plaintiff that "management was not interested in performing an audit at this time."

68.     On or about June 6, 2025, Plaintiff was terminated under the pretext of internal restructuring and a need for someone with more experience in post-award compliance and replaced by Ms. Lewis within the same day.  Thus, the latter rationale was quickly contradicted as a pretextual discharge because Ms. Lewis had significantly little to no prior post-award compliance experience or significantly less than Plaintiff.

15

69.    Courts in this Circuit have held that in employment anti-retaliation claims, weeks to several months constitutes "close temporal proximity" between the protected activity of the employee such as a complaint or opposition to an employer about its unlawful policies and/or practices and an adverse employment action such as discharge taken against the employee.

70.    As alleged throughout this Complaint, Defendant refused to comply with the audit requirements because it willfully and knowingly sought to avoid the fees and costs of a third party cost analysis for genome sequencing services so that it would obtain and maintain federal awards or payments by the government in excess of the amounts to which it was legally entitled.

71.    As alleged throughout this Complaint, Defendant summarily discharged Plaintiff in a knowing, wanton and malicious manner and/or in reckless disregard of the anti-retaliation laws in close temporal proximity to Plaintiff's Complaints to management that Defendant was in violation of the SSF Cost Analysis requirement under federal law.

72.    Accordingly, Plaintiff seeks relief and/or damages against Defendant under the anti-retaliation provisions of New York Labor Law §740(5) including but not limited to back pay, liquidated damages, interest, penalties, front pay in lieu of reinstatement, lost wages, benefits and other remuneration, emotional distress damages, punitive damages, damage to reputation, attorneys' fees and costs of litigation in amounts to be determined at the time trial.

### AS AND FOR A FIRST CAUSE OF ACTION
Discrimination and discharge based on race in violation of 42 USC §1981

73.    Plaintiff repeats and re-alleges each and every previous allegation as if fully set forth herein.

74.    42 USC §1981 states in relevant part, [a]ll persons within the jurisdiction of the United States shall have the same right in every State…to make and enforce contracts…and to the full

and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

75.    As alleged throughout this Complaint, the make and enforce contracts provision of §1981 includes the employee-employer relationship and "property" includes wages earned by employees.

76.    As alleged throughout this Complaint, §1981 (c) protects US citizens from impairment of rights by "nongovernmental discrimination and impairment under color of State law."

77.    As alleged throughout this Complaint, Plaintiff was a qualified employee within the meaning of all applicable statutes without a history of discipline or negative work performance evaluations.

78.    As alleged throughout this Complaint, on or about June 26, 2025, Defendant NYGC unlawfully discharged Plaintiff who is AsianAm from her employment to replace her with an unqualified employee named Heather Lewis who is AA.

79.    As alleged throughout this Complaint, Plaintiff was summarily discharged from her employment on or about June 26, 2025 which came as a complete surprise and shock to Plaintiff and her staff.

80.    As alleged throughout this Complaint, after learning about Plaintiff's discharge, a few members of her staff also quit their employment with NYGC.

81.    As alleged throughout this Complaint, Ms. Lewis was removed from the DRA position prior to Plaintiff's hire on or about 2023 due to negative work performance evaluations and complaints by staff about Ms. Lewis' leadership or management abilities.

82.    As alleged throughout this Complaint, when Plaintiff was hired by Defendant on or about 2023, she had significantly more post award compliance experience than Ms. Lewis.

83.    As alleged throughout this Complaint, despite the lack of qualifications and proven poor performance in the DRA role, Defendant not only put Ms. Lewis back in the DRA role on or about June 6, 2025 by terminating Plaintiff, at all relevant times, Defendant made Ms. Lewis the face of the company on its website touting that it had an AA employee.

84.    As alleged throughout this Complaint, Defendant and its management held a racial animus toward AsianAm employees including Plaintiff by relegating them to the background, never putting them in a client or public facing role as with Ms. Lewis and in this case, firing Plaintiff to vacate her DRA position for Ms. Lewis while disregarding AsianAm employees including Plaintiff's contributions, qualifications and professional accolades.

85.    However, the US Supreme Court has long held that racial preferences or set asides are defacto racial discrimination and unlawful, holding in relevant part, "We have time and again *forcefully rejected* the notion that government actors may intentionally allocate preference to those who may have little in common with one another but the color of their skin…One of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities…" *See, Students for Fair Admissions, Inc., Petitioner v. Harvard College and Univ. of N. Carolina et al.* 600 US 181, 220 (2023)

86.    The Supreme Court specifically held, "Given the history of discrimination against Asian Americans, especially their history with segregated schools, it seems particularly incongruous to suggest that a past history of segregationist policies toward blacks should be remedied at the expense of Asian American[s]" *See, Students for Fair Admissions, Inc., Petitioner v. Harvard College and Univ. of N. Carolina et al.* 600 US 181, 273 (2023).

87.    As alleged throughout this complaint, employment in a role or title is a zero-sum proposition as in student admissions because preference for one individual cuts off or forecloses that opportunity for the other individual.  In the instant case, Defendant's racial preference for Ms. Lewis who is AA unlawfully ended Plaintiff's employment and wages who is AsianAm

88.    As alleged throughout this complaint, but for Plaintiff's Asian race, she would not have been discharged.

89.    As alleged throughout this complaint, but for Plaintiff's Asian race she would not have been replaced in her position by Ms. Lewis based on her AA race.

90.    More recently as alleged throughout this Complaint, the President's EO prohibited "illegal DEI" which prohibited federal contractors like NYGC from maintaining DEI policies and practices that ignore merit and hire, fire or base terms and conditions of employment based on race or sex.

91.    As alleged throughout this Complaint, a fact finder may reasonably find that but-for Plaintiff's Asian race she would not have been discharged and displaced by an unqualified AA employee.

92.    As alleged throughout this Complaint, a fact finder may reasonably find that these circumstances give rise to the inference of Plaintiff's discharge based on her Asian race by Defendant.

93.    Accordingly, Defendant NYGC discriminated against Plaintiff based on her Asian race and unlawfully discharged Plaintiff in violation of 42 USC §1981 and seeks all available redress and remedies thereunder including but not limited to: back pay, lost wages, front pay in lieu of reinstatement, emotional distress damages, damages for reputational harm, punitive damages, reasonable attorney's fees, costs in amounts to be determined at the time of trial and any and other further relief that this Court deems just and proper.

## AS AND FOR A SECOND CAUSE OF ACTION
Discrimination based on race in violation of NYS HRL §296 et seq

94.    Plaintiff repeats and re-alleges each and every previous allegation as if fully set forth herein.

95.    New York State Executive Law ("NYS HRL") § 296 provides in relevant part, " 1. It shall be an unlawful discriminatory practice: (a)… because of an individual's … race …to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

96.    As set forth throughout this Complaint, Defendant discriminated against Plaintiff based on her Asian race, at least in part and was treated less well than her counterpart Ms. Lewis because she was the preferred AA race despite Ms. Lewis; lack of qualifications for the DRA position and removal from that position based on negative work performance evaluations and complaints about her leadership abilities.

97.    As set forth throughout this Complaint, Defendant and its management held a racial animus against AsianAm employees including Plaintiff.

98.    As set forth throughout this Complaint, Defendant and its management treated AsianAm employees including Plaintiff less well by relegating them to the background out of public view, not placing them in public facing roles including on NYGC's website and/or ignoring their contributions, qualifications and/or professional accomplishments and accolades meanwhile, touting Ms. Lewis on their website as their exemplary employee despite her removal from the DRA position, her negative job performance history and complaints from staff about her leadership abilities.

99.    As alleged throughout this Complaint, A fact finder may reasonably find that Plaintiff was discharged at least in part based on her Asian race.

20

100.    As alleged throughout this Complaint, A fact finder may reasonably find that Plaintiff was treated less well than AA employees when she was discharged based on her Asian race

101.    As set forth throughout this Complaint, Defendant knowingly, maliciously and in a wanton manner discriminated against Plaintiff based on her Asian race and replaced her with Ms. Lewis who was not qualified for the DRA position to remedy what Defendant perceived as historical racism against African or Black Americans at Plaintiff's expense which practice the Supreme Court has "forcefully rejected" to date.

102.    Accordingly, Plaintiff seeks all damages and relief under the NYS HRL §296 et seq. including but not limited to: back pay, front pay in lieu of reinstatement, lost wages, benefits and other remuneration, compensatory including mental anguish damages, punitive damages, attorney's fees and costs of the lawsuit in amounts to be determined at the time of trial and any and other further relief that this Court deems just and proper.

### AS AND FOR A THIRD CAUSE OF ACTION
Discrimination based on race in violation of NYC HRL 8-107

103.    Plaintiff repeats and re-alleges each and every previous allegation as if fully set forth herein.

104.    New York City Administrative Code ("NYC HRL") §8-107(1) states in relevant part, "It shall be an unlawful discriminatory practice: (a) For an employer … because of the actual or perceived **race** …of any person …to discharge such person..."

105.    As set forth throughout this Complaint, Defendant discriminated against Plaintiff based on her Asian race, at least in part and was treated less well than her counterpart Ms. Lewis who was African American or Black American and Ms. Lewis was not required to be qualified in the position and was paid a higher salary than Plaintiff.

21

106.    As alleged throughout this Complaint, a fact finder may reasonably find that Plaintiff was discharged at least in part based on her Asian race and/or treated less well than AA employees based on her Asian race.

107.    As set forth throughout this Complaint, Defendant knowingly, maliciously and in a wanton manner discriminated against Plaintiff based on her Asian race and replaced her with Ms. Lewis who was not qualified for the Director of RA position to remedy what Defendant perceived as historical racism against African or Black Americans at Plaintiff's expense which practice the Supreme Court has rejected to date.

108.    Accordingly, Plaintiff seeks all damages and relief under the NYC HRL §8-107 et seq. including but not limited to: back pay, front pay in lieu of reinstatement, lost wages, benefits and other remuneration, compensatory including mental anguish damages, punitive damages, attorney's fees and costs of the lawsuit in amounts to be determined at the time of trial and any and other further relief that this Court deems just and proper.

**AS AND FOR A FOURTH CAUSE OF ACTION**
Retaliation for protected activity in violation of NYLL §740

109.    Plaintiff repeats and re-alleges each and every previous allegation as if fully set forth herein.

110.    New York Labor Law §740(2) states in relevant part, "An employer shall not take any retaliatory action against an employee, whether or not within the scope of the employee's job duties because such employee does any of the following:…discloses, to a supervisor …an activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation…"

111.   As alleged throughout this Complaint, Plaintiff repeatedly complained to management from on or about February 2025 through June 2025 about Defendant's non-compliance with SSF cost analysis requirements for it federal contracts.

112.   As alleged throughout this complaint, Plaintiff complained to management in good faith that Defendant's practices, policies, procedures and/or omissions were in violation of federal law.

113.   As alleged throughout this Complaint, Defendant summarily discharged Plaintiff in retaliation for her complaints in a knowing, wanton and malicious manner and/or in reckless disregard of the anti-retaliation laws as her discharge was in close temporal proximity to Plaintiff's good faith complaints to management that Defendant was in violation of the cost analysis requirement under federal law for its federal contracts.

114.   Accordingly, Plaintiff seeks relief and/or damages against Defendant under the anti-retaliation provisions of New York Labor Law §740(5) including but not limited to back pay, liquidated damages, interest, penalties, front pay in lieu of reinstatement, lost wages, benefits and other remuneration, emotional distress damages, punitive damages, damage to reputation, attorneys' fees and costs of litigation in amounts to be determined at the time trial and any and other further relief that this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Khulangoo Rizaj requests that judgment be entered in her favor and against Defendant New York Genome Center, Inc. on liability and damages on all causes of action

First through Fourth and all available remedies under the applicable statutes and for such other and further relief as the Court deems just and proper as follows:

(a) On the First Cause of Action adjudge in favor of the Plaintiff that Defendant discriminated and discharged Plaintiff based on her Asian race and/or unlawfully preferred another racial group to discharge and displace Plaintiff in her position in violation of 42 USC §1981 and award damages including back pay, lost wages, front pay in lieu of reinstatement, emotional distress damages, damages for reputational harm, punitive damages, attorney's fees and costs; and

(b) On the Second and Third Causes of Action adjudge in favor of the Plaintiff that Defendant discriminated and discharged Plaintiff at least in part based on her Asian race and/or treated Plaintiff less well than another preferred racial group by discharging and displacing Plaintiff in her position with a member of the preferred racial group in violation of the NYS HRL §296 et seq. and/or NYC HRL §8-107 et seq, and award Plaintiff damages under the applicable statute including: back pay, lost wages, front pay in lieu of reinstatement, emotional distress damages, punitive damages, damage for reputational harm, attorney's fees and costs of litigation; and

(c) On the Fourth Cause of Action under the NYLL §740, adudge that Defendant retaliated against Plaintiff by discharging her for complaining in good faith to management that Defendant was violating federal laws and award relief under the statute including back pay, lost wages, front pay in lieu of reinstatement, penalties, punitive damages, liquidated damages, attorney's fees and costs of the lawsuit against Defendant; and

(d) Pre and Post Judgment Interest; and

(e) Penalties where applicable; and

24

(f)  Any and other further relief that this Court deems just and proper.

Dated: April 20, 2026

                                  Nisar Law Group, P.C.
                                  Attorneys for Plaintiff Khulangoo Rizaj

**By:** _____
                                  Susan Ghim, Sr.  Litigation Counsel
                                  One Grand Central Place
                                  60 East 42nd Street, Suite 4600
                                  New York, New York 10165
                                  TEL. 212.600.9534

.

25